UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID BURLINGHAM,
and MARYANN BURLINGHAM,

        Plaintiffs,

                                 Case No. 22-cv-1134-pp

   v.

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
and HUMANA HEALTH PLAN, INC.,

        Involuntary Plaintiffs,

   v.

PORTLAND ORTHOPAEDICS LIMITED,
MAXX HEALTH, INC., MIPRO US, INC.,
MIPRO ORTHO PTE, LTD., SYMMETRY MEDICAL, INC.
and TECOMET, INC.

        Defendants.

**ORDER GRANTING DEFENDANT TECOMET INC.'S RULE 12(B)(2) AND 12(B)(6) MOTION TO DISMISS (DKT. NO. 12), GRANTING DEFENDANT SYMMETRY MEDICAL, INC.'S RULE 12(B)(2) MOTION TO DISMISS (DKT. NO. 14), DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR ALTERNATE SERVICE ON CERTAIN DEFENDANTS AND MEMORANDUM OF LAW (DKT. NO. 17), GRANTING PLAINTIFFS' CIVIL L.R. 7(H) EXPEDITED NON-DISPOSITIVE MOTION TO EXTEND TIME TO SERVE DEFENDANTS AS TO DEFENDANTS PORTLAND ORTHOPAEDICS LIMITED AND MIPRO ORTHO PTE LIMITED (DKT. NO. 19), DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION TO EXTEND TIME TO SERVE DEFENDANTS AS TO DEFENDANT MIPRO US (DKT. NO. 19), GRANTING DEFENDANTS TECOMET INC. AND SYMMETRY MEDICAL, INC.'S RULE 12(B)(2) MOTION TO DISMISS HUMANA HEALTH PLAN, INC.'S CLAIM (DKT. NO. 33) AND REQUIRING PLAINTIFFS TO SHOW CAUSE AND FILE PROOF OF SERVICE**

1

On September 28, 2022, after David Burlingham's M-Cor Modular Hip System failed and required a revision surgery ten years after the initial 2010 implant, David and Maryann Burlingham filed this federal lawsuit. Dkt. No. 1. Allegedly, the "femoral neck" component of the hip replacement system broke, which caused the system to fail. Id. at ¶19. The plaintiffs have sued the original designer, distributor and seller of the "femoral neck" of the M-Cor system, its alleged successor corporations and an entity that has a distribution agreement with a manufacturer. Portland Orthopaedics Limited allegedly designed and manufactured the "femoral neck." Id. at ¶7. Symmetry Medical, Inc. allegedly manufactured the femoral neck component, using Portland Orthopaedics' specifications. Id. at ¶11. Tecomet purchased various "assets and inventory" from Symmetry four years after the implant procedure. Id. at ¶¶9, 10. Mipro Ortho allegedly owns Mipro US—the successor entity to Portland Orthpaedics. Id. at ¶12. Maxx Health has a distribution agreement with Mipro US to distribute the M-Cor femoral neck medical device. Id. at ¶14.

Just over four months after the plaintiffs filed suit, Medical Copay Plan of Froedtert South, Inc., through its plan manager involuntary plaintiff Humana Health Plan, Inc., filed a cross-claim against the plaintiffs and all the defendants, asserting that it had paid all plaintiff David Burlingham's medical expenses resulting from the failure of the hip implant, arguing that it was subrogated to the rights of the plaintiffs and asserting reimbursement rights against the plaintiffs should they recover damages. Dkt. No. 28.

There are five motions pending. Defendant Tecomet filed a motion to dismiss the complaint for failure to state a claim and lack of personal jurisdiction. Dkt. No. 12. Defendant Symmetry Medical, Inc. moved to dismiss the complaint for lack of personal jurisdiction. Dkt. No. 14. The plaintiffs filed a motion for leave to use alternate means to serve Portland Orthopaedics Ltd., Mipro US and Mipro Ortho Pte Ltd., dkt. no. 17, and have asked for additional time to effect service, dkt. no. 19. After Medical Copay Plan of Froedtert South, Inc., through Humana Health Plan, filed its cross-claim, Tecomet and Symmetry filed a joint motion to dismiss the derivative cross-claim for lack of personal jurisdiction. Dkt. No. 33.

## I. Defendant Tecomet Inc.'s Rule 12(b)(2) and 12(b)(6) Motion to Dismiss (Dkt. No. 12)

### A. Tecomet's Brief in Support (Dkt. No. 13)

Tecomet moves to dismiss under Rules 12(b)(2) and 12(b)(6), arguing that it is a successor corporation whose only connection to Wisconsin is unrelated to the plaintiffs' injuries. Dkt. No. 13 at 2. As to personal jurisdiction, Tecomet admits that it has a single contact with Wisconsin—a Kenosha manufacturing facility—but explains that it acquired the manufacturing facility in 2012, two years *after* Mr. Burlingham's hip implantation, and asserts that the facility never has manufactured any component of the M-Cor system or any other hip system. Id. at 2, 4. Under Rule 12(b)(6), Tecomet argues that the plaintiffs have not stated a claim because they acknowledge that Tecomet never manufactured or distributed any part of the hip system that Mr. Burlingham had implanted

in 2010. Id. at 3. Tecomet argues that it is the general rule in Wisconsin that a successor company is not liable for the acts of its predecessor. Id.

First addressing jurisdiction, Tecomet argues that general jurisdiction does not exist because Tecomet is "at home" in Massachusetts where it is incorporated and maintains its principal place of business. Id. at 6. Tecomet maintains that specific jurisdiction does not exist because its forum-related conduct in Wisconsin has no relationship to the plaintiffs' claims. Id. at 7. Tecomet reiterates that it had no presence in Wisconsin until it purchased a manufacturing facility in Kenosha in July 2012—again, two years *after* Mr. Burlingham's hip implant and over years *before* Tecomet acquired Symmetry. Id. at 8. It has filed a declaration of its executive vice president of Quality & Regulatory, stating that Tecomet never manufactured a modular hip system and played no role in the design, development, manufacture or testing of the system used by Mr. Burlingham. Id. (citing Dkt. No. 13-1 at ¶¶11-12). Tecoment says that by the time it acquired Symmetry, it had been five years since Symmetry had manufactured a femoral neck component for Portland Orthopaedics. Id. (citing Dkt. No. 13-1 at ¶¶5-9). According to Tecomet, the plaintiffs acknowledge that the alleged defective product was shipped out of the country by Symmetry to the designer (Portland Orthopaedics), who sold it to third parties (Mipro Ortho, Miro US and Maxx Health Inc.). Id. at 8-9 (citing Dkt. No. 1 at ¶¶12-14). Tecomet insists that it has no connection to the femoral neck component or the Burlinghams. Id. at 9.

Alternatively, Tecomet moves to dismiss under Rule 12(b)(6) because, it says, its acquisition of Symmetry years after the implantation does not give rise to liability. Id. at 10-11. Tecomet notes that the plaintiffs have asserted a "Product Line Transfer" theory of liability based on Tecomet's acquisition of Symmetry five years after Symmetry fabricated the femoral neck. Id. at 11. Tecomet says there is not "even one single" published Wisconsin or Seventh Circuit opinion that supports the theory. Id. According to Tecomet, it is "well established in Wisconsin that when a company sells or transfers all its assets to another company, 'the purchasing company does not become liable for the transferring company's debts and liabilities.'" Id. at 11 (citing Veritas Steel, LLC v. Lunda Constr. Co., 389 Wis. 2d 722, 732 (Wis. 1985)).

B.      Plaintiffs' Brief in Opposition (Dkt. No. 18)

The plaintiffs respond that Tecomet has had such extensive contacts with Wisconsin that its arguments are "borderline frivolous." Dkt. No. 18 at 3. The plaintiffs point out that on August 16, 2016 (six years after the implant), Tecomet registered as a foreign corporation with the Wisconsin Department of Financial Institutions and designated Corporation Services Company of Madison, Wisconsin as its registered agent for service. Id. at 3-4 (citing Dkt. No. 18-2). They assert that Tecomet maintains a website and advertises its products—including hip replacement products—to Wisconsin customers. Id. at 4 (citing Dkt. No. 18-3). The plaintiffs maintain that Tecomet posts employment opportunities in Wisconsin on LinkedIn. Id. at 4 (citing Dkt. No. 18-5). They ask, "If Tecomet believes that it is immune from suit in Wisconsin, then why in

5

over a dozen lawsuits filed garnishing the wages of its Wisconsin employees has Tecomet never once suggested that under Wisconsin law, Tecomet was not subject to the jurisdiction of Wisconsin courts under its long-arm statute, Wis. Stats. 801.05 or otherwise?" Id. at 6 (citing Dkt. No. 18-6).

As to the Rule 12(b)(6) argument—that Tecomet's acquisition of Symmetry did not result in Tecomet inheriting Symmetry's liabilities—the plaintiffs cite Janusz v. Symmetry Medical, Inc.., Case No. 15-cv-294-WED (E.D. Wis.).[1] Id. at 8. They state that a motion in that case raised the same argument that Tecomet raises here; they then include an extensive block quote from the Janusz decision. Id. at 8-9.

The plaintiffs also cite Springer v. Nohl Elec. Products Corp., 381 Wis. 2d 438, 463 (Wis. 2018) for its holding that the rule of successor non-liability is not absolute. Id. at 9-10. They assert that the exceptions to the rule focus on the nature of the transaction by which the successor obtained the former's assets. Id. at 10. The plaintiffs quote a statement by the president and CEO of Symmetry Medical (not Tecomet) in which he referred to the transaction as a

---

[1] In Janusz, the plaintiff sued Symmetry—one of the defendants in this case—as the manufacturer of the femoral neck components designed by Portland Orhtopaedics. Symmetry moved for summary judgment, arguing that it was not involved with the M-Cor Modular Hip System implanted in the plaintiff. Case No. 15-cv-294, Dkt. No. 94 at 2. Magistrate Judge William E. Duffin granted in part and denied in part Symmetry's summary judgment motion and addressed Symmetry's argument that a manufacturer "who merely manufactures a product designed by someone else cannot be held liable to the user of the product." Case No. 22-cv-1134, Dkt. No. 18 at 9 (citing Dkt. No. 18-7 at 23). Judge Duffin concluded that sellers are in the best position to disperse or absorb the costs associated with defective products. Id. (citing Dkt. No. 18-7 at 23).

"merger" rather than an "acquisition;" the plaintiffs argue that a merger would fall within the exception to successor non-liability. Id. (citing Dkt. No. 12-8 at 6). The plaintiffs argue that Tecomet now is the sole authorized manufacturer and distributor of the M-Cor Femoral Neck medical device. Id. at 11. They argue in their brief (although they did not assert it in the complaint) that Tecomet expressly or implicitly agreed to assume Symmetry's liability with respect to the device and that the Tecomet/Symmetry transaction amounted to a consolidation or merger. Id. The plaintiffs argue in their brief (but again, did not assert in the complaint) that Tecomet is a mere continuation of Symmetry and that there is the potential that Symmetry fraudulently conducted the transaction with Tecomet to escape liability. Id. They state, "This motion to dismiss is entirely premature and the record is not yet developed to aid this Court in deciding the factual issues in dispute regarding Tecomet's role in this case." Id.

C.    Tecomet's Reply (Dkt. No. 23)

Tecomet replies that the plaintiffs' "belated opposition" misconstrues and misapplies the "bedrock" principles of personal jurisdiction. Dkt. No. 23 at 1. In a footnote, Tecomet argues that the court should grant its motion to dismiss as a sanction because the plaintiffs filed their opposition brief nine days past the deadline. Id. at n.1. Tecomet argues that the plaintiffs have conflated general and specific jurisdiction based on the manufacturing facility acquired years *after* Mr. Burlingham's 2010 hip surgery. Id. at 6-7. Tecomet reminds the court that general jurisdiction over a foreign corporation exists only where the foreign

7

Case 2:22-cv-01134-PP   Filed 09/30/23   Page 7 of 64   Document 40

corporation's affiliations with the state are so "continuous or systematic" as to render the defendant at home in that state and that Tecomet is not "at home" in Wisconsin. Id. at 4, 6.

Tecomet also argues that the court does not have specific jurisdiction because Tecomet's limited contacts in Wisconsin have "*no connection*" with the alleged injury or the manufacture or sale of the M-Cor system. Id. It says that it had no presence in Wisconsin until 2012—two years after the implantation of the device. Id. at 2. It reasons that the court cannot exercise specific jurisdiction unless the suit-related conduct "create[s] a substantial connection with the forum state." Id. at 2 (citing Walden v. Fiore, 571 U.S. 277, 284 (2014)).

Tecomet reminds the court that the exhibits attached to the plaintiffs' opposition brief are "improper at the Rule 12(b)(6) motion-to-dismiss stage." Id. at 9. Tecomet asks the court to disregard the Janusz decision because it involved Symmetry—not Tecomet—and did not discuss a "product line transfer" theory of liability. Id.

D.      Plaintiffs' Surreply (Dkt. No. 26)

The plaintiffs—without seeking the court's leave—filed a seven-page "Surreply Brief in Opposition to Defendants Symmetry and Tecomet Rule 12 Motion(s) and Motion for the Imposition of Sanctions." Dkt. No. 26.[2] The caption is confusingly worded, but the body of the document does not ask the

---

[2] Most of this document consists of single-spaced, indented block quotes, with little argument from the plaintiffs themselves.

court to impose sanctions; it appears that the plaintiff filed the sur-reply for the purpose of replying to the footnote in Tecomet's reply in which *Tecomet* asked the court to grant its motion to dismiss as a sanction for the plaintiffs' tardy filing of their opposition brief. <u>Id.</u> at 2. The plaintiffs concede that there was a "slight tardiness" in the filing of their opposition brief but insist that they did not fail to file one. <u>Id.</u>

The plaintiffs then quote extensively from <u>Ford Motor Co. v. Montana Eighth Judicial District Court</u>, ___ U.S. ___, 141 S. Ct. 1017, 1026-27, 1029-30 (2021),[3] in which the Supreme Court rejected a "causation-only" approach between a plaintiff's lawsuit and a defendant's activities. Dkt. No. 26 at 3-4. Although little of the sur-reply was authored by the plaintiffs' counsel (rather than by federal and state judges in published decisions), the plaintiffs imply that it doesn't matter whether the court labels their theory "single enterprise" or "product line transfer" because the "theory rests on the same principles related to the piercing of corporate veils." <u>Id.</u> at 5-6.

    E.    <u>Analysis</u>

        1.    *Procedural Issues*

The court will not consider the plaintiffs' unauthorized sur-reply. Dkt. No. 26. The Federal Rules of Civil Procedure and this court's local rules contemplate a motion, an opposition brief and a reply. "Sur-replies generally are disfavored," <u>Gomez v. V. Marchese & Co.</u>, Case No. 20-cv-1802, 2023 WL

---

[3] The plaintiffs did not provide a pinpoint cite to the pages from which they extensively quoted.

4059090, at *8 (E.D. Wis. June 19, 2023) (citation omitted). Courts grant leave to file them "only rarely." Id. (quoting Groshek v. Time Warner Cable, Inc., Case No. 15-cv-157, 2016 WL 4203506, at *4 (E.D. Wis. Aug. 9, 2016), *aff'd* 865 F.3d 884 (7th Cir. 2017)). The plaintiffs did not ask the court for leave to file a sur-reply, and their explanation for filing one is that the defendants' counsel "has in effect amended his 12b Motion to Dismiss to include a request for the imposition of sanctions." Id. at 2. For the reasons it will explain below, the court would not have granted Tecomet's request for a sanction, so the court considering an unauthorized reply brief would do nothing more than allow the plaintiffs to get the "last word" on the substance of Tecomet's motion.

The court *will* consider the plaintiffs' opposition brief to Tecomet's motion to dismiss (even though it was filed late) and—as indicated—it will deny Tecomet's request that the court grant its motion to dismiss as a sanction for the late filing. Civil Local Rule 7 requires that a brief in opposition to a motion to dismiss be filed within twenty-one days of the motion. Civil L.R. 7(b) (E.D. Wis.). Tecomet filed its motion to dismiss on December 12, 2022; the plaintiffs filed their response on January 12, 2023—*thirty-one* days later—without requesting an extension of time.

The court expects all parties to comply with the local rules (available at httsp://www.wied.uscourts.gov, under "For Attorneys," "Local Rules and Guidance"). But Tecomet buried its motion for a sanction—and a severe sanction, at that—in a footnote in a reply brief; the only mechanism the plaintiffs had to oppose the request was a disfavored sur-reply. Tecomet did not

give the plaintiffs the courtesy of filing a separate motion, to which they could have responded using the procedures in Civil L.R. 7. Tecomet's sanctions request—like the plaintiffs' unauthorized sur-reply—was procedurally improper.

Further, in support of the sanction request, Tecomet cited Civil L.R. 7(d); that rule states that "[f]ailure to comply with the briefing requirements in Civil L.R. 7(a)-(b) *may* result in sanctions up to and including the Court denying or granting the motion." The rule gives a court the discretion to impose sanctions on a party who does not comply with the briefing requirements of Civil L.R. 7— including the deadlines for filing—but it does not require a court to do so. Most courts, and certainly this one, proceed with caution in considering sanctions and impose them as a last resort. Asking for the severe sanction of dismissal as punishment for a party who files a pleading nine days late (albeit without requesting an extension of time) is unreasonable—particularly when, at this stage of the litigation, there is no prejudice to Tecomet because the court has not been able to address the motion to dismiss until now and Tecomet had the opportunity to file a reply brief. Imposing the sanction of dismissal on the plaintiffs under these circumstances would be Draconian, and the court will not do so.

Finally, the plaintiffs attached to their opposition to Tecomet's motion to dismiss eight exhibits—declarations, affidavits, printouts and a court opinion. Dkt. Nos. 18-1 through 18-8. To the extent that the plaintiffs provided those exhibits in opposition to Tecomet's motion to dismiss under Rule 12(b)(2) for

11

lack of personal jurisdiction, the court may consider them; once a defendant moves to dismiss for lack of personal jurisdiction, the burden is on the plaintiff to prove that the court has personal jurisdiction. See, *e.g.*, Purdue Research Foundation v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003). But to the extent the plaintiffs provided those exhibits in opposition to Tecomet's motion to dismiss for *failure to state a claim*, the court cannot consider them. "Ordinarily, when adjudicating a motion to dismiss under Rule 12(b)(6), a district court is limited to the allegations in the complaint." Financial Fiduciaries, LLC v. Gannett Co., Inc., 46 F.4th 654, 663 (7th Cir. 2022) (citing Gen. Elec. Cap. Corp. v. Lease Resol. Corp., 128 F.3d 1074, 1080 (7th Cir. 1997)). Federal Rule of Civil Procedure 12(d) mandates that when considering a Rule 12(b)(6) motion, if a court considers "matters outside the pleadings," it must treat the motion as a motion for summary judgment, with all the procedural requirements that entails. Id.

In sum: the court will not consider the unauthorized sur-reply, dkt. no. 26; the court will consider the plaintiffs' brief in opposition to Tecoment's motion to dismiss, dkt. no. 18; the court will not grant the request for sanctions Tecomet made in footnote 1 of its reply brief, dkt. no. 23 at 1, n.1; and the court will not consider the exhibits attached to the plaintiffs' opposition brief when considering Tecomet's motion to dismiss for failure to state a claim, dkt. no. 18-1 through 18-1.

### 2. *Legal Standards*

As noted, Tecomet moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2) and for failure to state a claim under 12(b)(6).

A Rule 12(b)(2) motion tests the court's personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). The court takes the facts asserted in the complaint as true and the complaint need not allege facts demonstrating the existence of personal jurisdiction, but once the defendant moves to dismiss the complaint for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of demonstrating the existence of jurisdiction." Curry v. Revolution Labs., LLC, 949 F.3d 385, 392 (7th Cir. 2020) (quoting Purdue Research, 338 F.3d at 782). If the court decides a Rule 12(b)(2) motion on written submission, without an evidentiary hearing, the plaintiff bears the burden of making only a *prima facie* case for personal jurisdiction. Id. (quoting uBID, Inc. v. GoDaddy Grp., Inc., 623 F.3d 421, 423 (7th Cir. 2010)). But if the defendants submit "evidence opposing the district court's exercise of personal jurisdiction, the plaintiff [ ] must similarly submit affirmative evidence supporting the court's exercise of jurisdiction." Matlin v. Spin Master Corp., 921 F. 3d 701, 705 (7th Cir. 2019).

Because Tecomet has challenged whether the court has personal jurisdiction over it, the plaintiffs bear the burden of demonstrating that it does. Neither party asked the court to hold an evidentiary hearing; they submitted their personal jurisdictional arguments by written submission. That means that the plaintiffs bear the burden of making only a *prima facie* case for

personal jurisdiction, by submitting affirmative evidence demonstrating the existence of that jurisdiction.

On the other hand, a Rule 12(b)(6) motion attacks the allegations within the four corners of the complaint. When considering a motion to dismiss for failure to state a claim, courts "take all the factual allegations in the complaint as true," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and draw all reasonable inferences in the plaintiff's favor, Roberts v. City of Chicago, 817 F.3d 561, 564 (7th Cir. 2016). In contrast to a motion to dismiss under Rule 12(b)(2), a court considering a motion to dismiss under Rule 12(b)(6) generally cannot consider matters outside the pleadings. See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

3. *Personal Jurisdiction*

A federal court may adjudicate a controversy only if it has authority over the type of claim raised in the lawsuit (subject-matter jurisdiction) and the parties to that lawsuit (personal jurisdiction). Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577 (1999). "The requirement that a court have personal jurisdiction flows . . . from the Due Process Clause" of the Fourteenth Amendment. Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982).

> The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial

14

> power not as a matter of sovereignty, but as a matter of individual liberty. Thus, the test for personal jurisdiction requires that "the maintenance of the suit ... not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 . . . (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463 . . . (1940).

Id. at 702-03. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting International Shoe, 326 U.S. at 319.

"Service of process is how a court gets jurisdiction over the person." Lisak v. Mercantile Bancorp, Inc., 834 F.2d 668, 671 (7th Cir. 1987). Federal Rule of Civil Procedure 4(k)(1)(A) states that serving a summons on a party subject to the jurisdiction of a court of general jurisdiction in the state where that district court is located "establishes personal service" over that defendant. The question involved in challenges to personal jurisdiction is whether the party who has been served with the summons is "subject to the jurisdiction of" the state in which the district court presiding over the case is located. Id.

The Seventh Circuit has said that for constitutional (due process) purposes, "the key issue . . . is whether the defendant has sufficient 'minimum contacts' with the forum state such that 'the maintenance of the suit "does not offend traditional notions of fair play and substantial justice."'" Felland v. Clifton, 682 F.3d 665, 672 (7th Cir. 2012) (quoting Tamburo v. Dworkin, 601 F.3d 693, 701 (7th Cir. 2010), which quoted International Shoe, 326 U.S. at 316). Due process requires that individuals or corporations have "fair warning"

15

that certain activities may subject them to suit in a particular forum. Burger

King, 471 U.S. at 471 (quoting Shaffer v. Heitner, 433 U.S. 186, 218 (1977)

(Stevens, J., concurring in the judgment)). That "fair warning" requirement can

be satisfied, for due process purposes, if the defendant "purposefully" directs

its activities at the residents of the forum and "the litigation results from

alleged injuries that 'arise out of or relate to' those activities." Id. at 472

(quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984);

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)).

> Each defendant must have 'purposely established minimum contacts with the forum state such that he or she 'should reasonably anticipate being haled into court' there." [*International Shoe*, 326 U.S. at 216, quoting *Burger King*, 471 U.S. at 474]. Jurisdiction cannot be avoided simply because a defendant did not physically enter the forum state, *Burger King*, 471 U.S. at 476 . . . , but [the Seventh Circuit] has also said that "[p]otential defendants should have some control over—and certainly should not be surprised by— the jurisdictional consequences of their actions," *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997).

Felland, 682 F.3d at 673.

a.     Types of Personal Jurisdiction

There are two types of personal jurisdiction: "'general' (sometimes called

'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked')

jurisdiction." Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco

C'nty, 582 U.S. 255, 262 (2017) (quoting Goodyear Dunlop Tires Operations,

S.A. v. Brown, 564 U.S. 915, 919 (2011)).

For corporations, the "place of incorporation and principal place of

business are 'paradig[m] … bases for general jurisdiction.'" Daimler AG v.

16

Bauman, 571 U.S. 117, 137 (2014) (quoting Lea Brilmayer, Jennifer Haverkamp, Buck Logan, *A General Look at General Jurisdiction*, 66 Texas L. Rev. 721, 735 (1988)).[4] Put another way, for a corporation, the "paradigm forum for the exercise of general jurisdiction is" "one in which the corporation is fairly regarded as at home." Bristol-Myers, 582 U.S. at 262 (quoting Goodyear, 564 U.S. at 924). See also, Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796, 800 (7th Cir. 2014).

General jurisdiction is powerful; if a court has general jurisdiction over a corporate defendant, the court "may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." Bristol-Myers, 582 U.S. at 262 (quoting Goodyear, 564 U.S. at 924). So for a court to have *general* personal jurisdiction over a corporation, the corporation must either be a "resident" of the state in which the district court sits (be domiciled there, have its place of incorporation there or have its principal place of business there), or its "continuous corporate operations within [that] state [must be] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." Goodyear, 564 U.S. at 924 (quoting International Shoe, 326 U.S. at 318). "[O]nly a limited set of affiliations with a forum will render a defendant

---

[4] As the Supreme Court has noted, the place of incorporation and the principal place of business, as well as corporate domicile, "have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable," and they give plaintiffs "recourse to at least one clear and certain forum in which a corporate defendant maybe sued on any and all claims." Daimler AG, 571 U.S. at 137.

17

amenable to" general jurisdiction there. <u>Daimler AG</u>, 571 U.S. at 137. For a corporation not a "resident" of the state in which the district court sits, its affiliations with that state must be "so 'continuous and systematic' as to render [it] essentially at home in the forum state" for the court to have general jurisdiction. <u>Id.</u> at 749 (quoting <u>Goodyear</u>, 564 U.S. at 919).

In contrast, specific jurisdiction exists only when the lawsuit arises out of, or relates to, the defendant's contacts with the forum state. <u>Bristol-Myers</u>, 582 U.S. at 262.

> In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear,* 564 U.S., at 919, 131 S.Ct. 2846 (internal quotation marks and brackets omitted). For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Ibid.* (internal quotation marks omitted).

<u>Id.</u> "[T]here must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or occurrence that takes place in the forum State.'" <u>Id.</u> at 264 (quoting <u>Goodyear</u>, 564 U.S. at 919). If there is no such connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." <u>Id.</u>

        b.     Source of Law Governing Scope of Personal Jurisdiction

There are federal statutes that prescribe the scope of a district court's personal jurisdiction by authorizing nationwide service of process. <u>See</u> Fed. R. Civ. P. 4(k)(1)(c); 4(k)(2). <u>See also, *e.g.*</u>, 18 U.S.C. §1965(b) (the portion of the civil RICO statute authorizing nationwide service); 15 U.S.C. §78aa(a) (the

portion of the Securities Exchange Act of 1934 authorizing nationwide service of process). This case does not involve such a statute; the plaintiffs have sued the defendants for state-law causes of action under the court's diversity subject-matter jurisdiction. Dkt. No. 1 at ¶1 ("Jurisdiction is based on diversity of citizenship, pursuant to 28 U.S.C. §1332.").

In cases that do not involve a federal statute authorizing nationwide service of process, a federal court looks to the law of the forum state in which it sits to determine the limits of its personal jurisdiction. Adv. Tactical Ordnance, 751 F.3d at 800; see also Felland, 682 F.3d at 672; Dworkin, 601 F.3d at 700. This court looks to Wisconsin law; the Wisconsin statute governing personal jurisdiction is Wis. Stat. §801.05—Wisconsin's so-called "long-arm" statute. "A court's exercise of personal jurisdiction may be limited by the applicable state statute or the federal Constitution . . . ." Dworkin, 601 F.3d at 700. In Wisconsin, the statutory and federal constitutional inquiries merge; Wis. Stat. §801.05 "was intended to provide for the exercise of jurisdiction over nonresident defendants to the full extent consistent with the requisites of due process of law.'" Rasmussen v. Gen. Motors Corp., 335 Wis. 2d 1, 15 (Wis. 2011) (quoting Flambeau Plastics Corp. v. King Bee Mfg. Co., 24 Wis. 2d 459, 464 (Wis. 1964), overruled on other grounds).

The Wisconsin statute addresses both types of personal jurisdiction: §801.05(1) grants Wisconsin courts personal jurisdiction over defendants with "local presence or status," while the remaining provisions of the statute list types of contact with the state that may subject a defendant to a Wisconsin

19

court's specific jurisdiction. The Wisconsin Supreme Court has held that the statute "is to be construed liberally in favor of the exercise of personal jurisdiction." Rasmussen, 335 Wis. 2d at 13.

"Wisconsin courts often treat the personal-jurisdiction analysis as a two-step process, putting the statutory question before the constitutional one." Felland, 682 F.3d at 678 (citing Kopke v. A. Hartrodt S.R.L., 245 Wis. 2d 396, 408-09 (Wis. 2001)). But the Seventh Circuit has emphasized that

> that framework should not be taken to imply that [Wisconsin's] long-arm statute limits the exercise of personal jurisdiction any more than basic considerations of due process. To the contrary, the constitutional and statutory questions tend to merge; compliance with the Wisconsin long-arm statute creates a presumption that constitutional due process is satisfied, although the defendant of course has the opportunity to dispute personal jurisdiction on purely constitutional grounds. Once the requirements of due process are satisfied, then there is little need to conduct an independent analysis under the specific terms of the Wisconsin long-arm statute itself because the statute has been interpreted to go to the lengths of due process.

Id. (citation omitted).

c.    General Jurisdiction

i.    **Wis. Stat. §801.05(1)**

Under Wisconsin's long-arm statute, a court sitting in Wisconsin—including this one—has general jurisdiction over a corporate defendant who, "when the action is commenced," "[i]s a domestic corporation or limited liability company" or "[i]s engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise." Wis. Stat. §801.05(1)(c) and (d). The "domestic corporation or limited liability company" requirement is Wisconsin's version of the "paradigm bases" of

20

corporate residency. The "substantial and not isolated activities" requirement is Wisconsin's version of the substantial continuous operations requirement.

The plaintiffs' opposition brief does not mention general or specific jurisdiction. While it quotes chunks from Supreme Court and Seventh Circuit decisions, the brief does not distinguish between cases concerning general jurisdiction and those concerning specific jurisdiction.

The complaint itself and the brief, however, seem to concede that Tecomet is not (and was not at the time the plaintiffs filed suit on September 28, 2022) a "domestic corporation or a limited liability company" under Wis. Stat. §801.04(1)(c). The complaint alleges that Tecomet "is a foreign corporation organized and existing pursuant to the laws of the State of Massachusetts, whose principal place of business is at 115 Eames Street Wilmington, MA 01887." Dkt. No. 1 at ¶9. The plaintiffs' opposition brief argues that "[a]ny 'foreign' corporation that comes into Wisconsin's Eastern District" and performs certain activities "cannot now be heard to complain that this court does not have personal jurisdiction over them." Dkt. No. 18 at 7-8. By referring to Tecomet as a "foreign" corporation, the plaintiffs implicitly concede that Tecomet is not a domestic (Wisconsin) corporation. Tecomet's motion confirms as much, stating that it is organized under the laws of Massachusetts and that its headquarters have been in Wilmington, Massachusetts since 1988. Dkt. No. 13 at 3.

Further, the plaintiffs' opposition brief does not cite Wis. Stat. §801.05(1)(c) (the portion of the statute that grants general jurisdiction over

21

domestic corporations). It cites only Wis. Stat. §801.05(1)(d), the "substantial and not isolated activities" basis for general jurisdiction. The court concludes that the only possible basis for the court's exercise of *general* jurisdiction over Tecomet under Wisconsin's long-arm statute is Wis. Stat. §801.05(1)(d), which grants Wisconsin courts general jurisdiction over a defendant "engaged in substantial and not isolated activities within this state . . . ."

Without citing any statute or case, the plaintiffs assert that Tecomet "has had such extensive contacts with the State of Wisconsin and its Eastern District in particular as to render [Tecomet's] argument borderline frivolous." Dkt. No. 18 at ¶5. The court assumes that the contacts the plaintiffs lists are meant to show that as of the time the plaintiffs commenced this lawsuit, Tecomet had engaged in substantial and not isolated activities in Wisconsin. The court first will analyze the activities the plaintiffs identify, then will consider the factors that Wisconsin courts apply in determining whether general jurisdiction exists under Wis. Stat. §801.05(1)(d).

The plaintiffs first emphasize that Tecomet registered as a foreign corporation with the Wisconsin Department of Financial Institutions and, on January 4, 2023, filed a Change of Registered Agent naming Corporation Services of Madison, Wisconsin as the registered agent for service of process in Wisconsin. Dkt. No. 18 at 3. But the Wisconsin Supreme Court has held that a foreign corporation's compliance with the statute requiring maintenance of a registered agent does not confer general jurisdiction. Segregated Account of

<u>Ambac Assurance Corp. v. Countrywide Home Loans, Inc.</u>, 376 Wis. 2d 528, 545 (Wis. 2017).

The plaintiffs next assert that Tecomet has a website that advertises products (such as hip replacement products) to Wisconsin consumers. Dkt. No. 18 at 4; Dkt. No. 18-3. "Substantial activity" under §801.05(1)(d) "generally incudes soliciting, creating, nurturing, or maintaining a continuing business relationship with anyone in the state, whether through in-person contact or long-distance communication." <u>Chizek v. Hull Porter Trailers, Inc.</u>, 980 N.W. 2d 492, *2 (Table) (Wis. Ct. App. 2022) (citing <u>Druschel v. Cloeren</u>, 295 Wis. 2d 858, 865 (Wis. Ct. App. 2006)). But the Wisconsin Court of Appeals has concluded that having a website (or a Facebook page) is not sufficient to subject a defendant to general jurisdiction if the site does not "specifically target[] Wisconsin customers." <u>Id.</u>, *3. The exhibit the plaintiffs provided the court is a screenshot from https://www.tecomet.com/medical-markets/ specialty/hip/. Dkt. No. 18-3. This page is not directed at Wisconsin consumers/customers, or *any* specific consumers/customers. It asserts that it has "hip solutions" that will "help patients get back to the things they love." <u>Id.</u> at 2. Any Wisconsin consumer who accesses the site will see the ad, but so will any California consumer or Florida consumer or Toronto consumer.

The plaintiffs next argue that Tecomet's website lists among their "worldwide facilities" a plant in Kenosha. Dkt. No. 18 at 4. They attach another page from the website, this one indicating that Tecomet has sixteen global manufacturing facilities in five countries around the world; it lists a plant in

Kenosha, Wisconsin. Dkt. No. 18-4 at 5. Under "Capabilities" for the Kenosha plant, the site lists, "CNC Machining, EDM, Finishing, Special Processes." Id. It identifies "End Markets" as "Orthopedics, SET, Advanced Surgical." Id. Tecoment vice president Hinora avers that Tecomet purchased the facility from an equipment manufacturer, that it is the only physical presence Tecomet has in Wisconsin and that the Kenosha facility manufactures medical devices and components but never has fabricated a femoral neck—not for the M-Cor system or any other modular hip system. Dkt. No. 13-1 at ¶¶10-12. The court will consider this in addressing the factors Wisconsin courts utilize to determine whether a defendant has substantial but not isolated activities in the state.

Finally, the plaintiffs argue that Tecomet has used its website to hire for positions at the Kenosha plant. Dkt. No. 18 at 4, Dkt. No. 18-5. This is, in effect, an argument that Tecomet has a physical presence in Wisconsin—part of the prior argument.

Having concluded that two of the facts the plaintiffs have identified do not suffice to demonstrate "substantial and not isolated" activity for the purposes of §801.05(1)(d), the court looks to factors Wisconsin courts use in analyzing whether a defendant has engaged in "substantial and not isolated" activities in the state. Wisconsin courts consider a defendant's "general contacts with the state," including "the quantity of the contacts, the nature and quality of those contacts, the source and connection of the contacts to the claim made, the interest of Wisconsin in the action and the convenience of the parties." Rasmussen, 335 Wis. 2d at 14 (citing Nagel v. Crain Cutter Co., 50

24

Wis. 2d 638, 648 (Wis. 1971)). The plaintiffs did not acknowledge or address these factors in their brief.

Quantity of contacts: The plaintiffs' evidence demonstrates that Tecomet's contacts with Wisconsin as of the September 2022 commencement of the lawsuit were limited. At the time the lawsuit commenced, Tecomet had been registered as a foreign corporation since August 2012—not coincidentally, around the time it purchased the Kenosha facility. Dkt. No. 18-2 at 2. It owned (and still owns) a single facility in Kenosha; that facility manufactured parts and components but not the part involved in this lawsuit. Tecomet has owned that facility for about eleven years. That is the only evidence the plaintiffs have provided the court about the quantity of contacts Tecomet has with Wisconsin.

The fact that at the time the lawsuit commenced, Tecomet owned a facility in Wisconsin and had done for about ten years weighs in favor of the conclusion that Tecomet has not had "isolated" contact with Wisconsin. But the presence of a single manufacturing facility for a company that has sixteen facilities globally tells the court little about whether Tecomet's activity in Wisconsin has been "substantial." The plaintiffs have provided no information about how many employees worked at the plant as of September 2022, how much product the plant produced, how many customers it serviced or what percentage of Tecomet's revenue it produces.

Nonetheless, the court concludes that the presence of the Kenosha plant weighs in favor of concluding that Tecomet had "substantial and not isolated" contact with Wisconsin.

25

Nature and quality of contacts: In addition to demonstrating that Tecomet has a plant in Kenosha, the plaintiffs provided a screenshot taken January 11, 2023 from LinkedIn, indicating that, at that time, Tecomet was advertising for various positions at the Kenosha location, including a senior regulatory and quality manager, a supply chain manager, machinists and other positions. Dkt. No. 18-5 at 1-3. But Wisconsin's long-arm statute requires that the defendant have substantial and not isolated contacts with Wisconsin at the time the lawsuit commences; the plaintiffs filed this lawsuit in September 2022, months before the LinkedIn screenshot shows Tecomet looking for employees at the Kenosha plant. While it is reasonable to assume that in September 2022, Tecomet had employees and may well have been seeking applicants, the plaintiffs have not provided proof to support that assumption. And it is the *plaintiffs'* burden to make a *prima facie* case of personal jurisdiction.

Again, though, the bigger gap in the plaintiffs' proof is the absence of any explanation about the role the Kenosha plant played in September 2022 in Tecomet's overall structure. The plaintiffs have provided the court with nothing more than proof that Tecomet has had a plant in Kenosha for a decade and that, in January 2023, it was seeking applicants for jobs at that plant. They have not provided sufficient information for the court to determine whether the "nature and quality" of Tecomet's contacts weigh in favor of or against the conclusion that Tecomet has had "substantial and not isolated" activity in Wisconsin.

Source of the contacts and their connection with the cause of action: The plaintiffs have provided the court with little information about this factor, but Tecomet has filled in the gaps. Tecomet vice president Hinora avers that on December 4, 2014, Tecomet acquired Symmetry Medical. Dkt. No. 13-1 at ¶3. Symmetry had stopped manufacturing the femoral neck component that is the subject of this lawsuit five years earlier. Id. at ¶9. Hinora avers—without dispute—that Tecomet played no role in the design, development, manufacture, testing, distribution or sale of the M-Cor system. Id.

Hinora also avers that Tecomet purchased the manufacturing facility in Kenosha in July 2012 (about two and a half years *before* Tecomet acquired Symmetry). Id. at ¶10. This was the first physical presence that Tecomet had in Wisconsin, and it remains Tecomet's only physical presence in Wisconsin. Id. at ¶11. And the Wisconsin facility never has fabricated or manufactured a femoral neck for Portland Orthopaedic's M-Cor Modular Hip System or any other modular hip system. Id. at ¶12.

The source of Tecomet's contacts in Wisconsin have no connection to the cause of action. This factor weighs strongly against the conclusion that Tecomet had "substantial and not isolated" activity in Wisconsin sufficient to subject it to general jurisdiction.

Interests of the State of Wisconsin: The plaintiffs have provided no evidence that would relate to this factor. Wisconsin courts have held that Wisconsin has an interest in protecting its citizens from breaches of contract (Druschel v. Cloeren, 295 Wis. 2d 858, 867 (Wis. Ct. App. 2006)) and in

27

assuring adequate levels of child support (McCarthy v. McCarthy, 146 Wis. 2d 510, 514 (Wis. Ct. App. 1988)). Perhaps Wisconsin has an interest in adjudicating claims when injuries occur in Wisconsin, and when goods are manufactured in the state. But the complaint does not allege whether the implantation surgery occurred in Wisconsin or whether it failed in Wisconsin. It is undisputed that the component that allegedly failed was not manufactured in Wisconsin. At best, the court can surmise that Wisconsin has an interest in protecting its residents from defective products, but if that were enough to support "substantial and not isolated" activity in the state, Wisconsin could obtain general jurisdiction over any company anywhere whose allegedly defective product was purchased by a Wisconsin resident, regardless of the place of production or the place of injury.

Because the Wisconsin long-arm statute must be construed liberally in favor of finding jurisdiction, the court concludes that this factor weighs very slightly in favor of finding that Tecomet had "substantial and not isolated" activity in Wisconsin.

Convenience of the parties: The plaintiffs reside in Kenosha. Tecomet's headquarters are in Wilmington, Massachusetts. Although Tecomet has a facility here in Wisconsin, that facility has no relationship to the claims in this lawsuit. Presumably Wisconsin is the most convenient forum by far for the plaintiffs, while it likely is inconvenient for Tecomet. This factor is a "wash."

Miscellaneous: The plaintiffs assert that Tecomet never has argued that it was not subject to jurisdiction in Wisconsin in "over a dozen lawsuits

28

garnishing the wages of Wisconsin employees." Id. at 5 (citing Dkt. No. 18-6, a list of cases involving Tecomet). This is not one of the five factors Wisconsin courts consider in determining whether a defendant has "substantial and not isolated" activity in Wisconsin, and the court is hard-pressed to see its relevance. Tecomet would have little incentive to raise a jurisdictional defense to a *garnishment* action brought against one of its Wisconsin employees. Tecomet is simply the party required to set aside a portion of the employee's wages for the party seeking garnishment; it is the "garnishee-defendant," not a party in actual interest.

As the court has explained, Wisconsin's long-arm statute is to be liberally construed in favor of jurisdiction. Lincoln v. Seawright, 104 Wis. 2d 4, 9 (Wis. 1981). Despite one factor weighing very heavily against this conclusion, the court concludes that the plaintiffs have—just barely—stated a *prima facie* case that Tecomet has conducted "substantial and not isolated" activity in Wisconsin, due to its having a plant and employees in Kenosha at the time the lawsuit was commenced.

ii. **Due Process**

As the Seventh Circuit explained in Felland, however, the fact that a plaintiff has satisfied the Wis. Stat. §801.05(1)(d) factors does not end the inquiry; it creates only a *presumption* that the constitutional due process requirements have been satisfied. Tecomet argues that they have not been. The court agrees.

Case 2:22-cv-01134-PP   Filed 09/30/23   Page 29 of 64   Document 40

As noted, "[t]he threshold for general jurisdiction is high; the [defendant's] contacts [with the forum state] must be sufficiently extensive and pervasive to approximate physical presence." Dworkin, 601 F.3d at 701. Tecomet is not domiciled in Wisconsin, is not incorporated in Wisconsin and does not have its principal place of business in Wisconsin. The "paradigm" bases for this court to exercise general jurisdiction over Tecomet do not exist.

But, as Wisconsin did in Wis. Stat. §801.05(1)(d), the United States Supreme Court left open the possibility that there could be exceptional circumstances that would make a foreign corporate defendant like Tecomet "at home" in Wisconsin. Wisconsin requires "substantial and not isolated" activity in the state. Due process requires that the foreign defendant's "continuous corporate operations within [that] state [must be] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." Goodyear, 564 U.S. at 924 (quoting International Shoe, 326 U.S. at 318).

The plaintiffs have asserted that Tecomet is registered in Wisconsin as a foreign corporation and that it has a registered agent in Madison, that it has a plant in Wisconsin, that it maintains a website that lists its Kenosha manufacturing plant and allegedly advertises to Wisconsin customers and that in the three weeks before the plaintiffs filed their opposition brief, Tecomet advertised for positions in Kenosha at the manufacturing facility. For due process purposes, these facts are not sufficient to demonstrate the continuous and substantial operations that would subject Tecomet to the kind of general

30

jurisdiction that would subject it to suit in Wisconsin regardless of the suit's connection to the state.

The issue is not whether Tecomet's Wisconsin contacts are continuous, but whether they are so continuous and substantial, and of such a nature, as to render Tecomet essentially at home in Wisconsin. In other words, Tecomet—a foreign corporation—must have an affiliation with the state such that it is comparable to a domestic enterprise. Daimler AG, 571 U.S. at 133 n.11, 138-39. The court considers the corporation's activities "in their entirety, nationwide and worldwide," because a corporation that operates in many places can "scarcely be deemed at home in all of them." Id. at 139, n.20.

The court has explained that registering as a foreign corporation in Wisconsin does not confer general jurisdiction. Segregated Account, 376 Wis. 2d at 555. Similarly, operating a website accessible to Wisconsin residents—without more—is insufficient to establish general jurisdiction. Dworkin, 601 F.3d at 701 (operating a public website accessible to Illinois residents does not support general jurisdiction).

That leaves the existence of the Kenosha manufacturing facility. A district court in the Southern District of Illinois declined to find that General Electric was at home in Illinois even though it had conducted business in Illinois since 1897, employed more than 4,300 employees in Illinois and leased more than 500,000 square feet in the state. Perez v. Air and Liquid Sys. Corp., Case No. 16-CV-00842, 2016 WL 7049153, *4 (S.D. Ill. Dec. 2, 2016). The court reasoned that although GE had a presence in Illinois, it could not

31

conclude that GE was "at home" in the state given its status as a global corporation. Id.

More recently, a district court in the Northern District of Illinois held that defendants were "not at home" in Illinois where one of the defendants was Amazon and the other defendant had 133 dealers in Illinois, a registered agent in Illinois and a large office/warehouse in Illinois. Nautilus Ins. Co. v. COA, Inc., Case No. 22 C 5997, 2023 WL 2933055, *3 (N.D. Ill. Apr. 13, 2023). The court reasoned:

> For Amazon, while its dozens of facilities, thousands of employees, and solicitation of business in Illinois are certainly significant, those contacts do not suffice to make Amazon "at home" in Illinois. *See BNSF Ry. Co. v. Tyrell*, 581 U.S. 402, 410 (2017) (railway was not "at home" in Montana despite having over 2,000 miles of railroad track and more than 2,000 employees there). The key is that Amazon has similar numbers of facilities and employees in numerous states across the country, and even more contacts in Texas, California, and Washington. *See* R. 30-3. "A corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 571 U.S. at 140 n.20*; see also Garcia v. NutriBullet*, L.L.C., No. 2:21-cv-09348-DDP, 2022 WL 3574699, at *2 (C.D. Cal. July 14, 2022) (finding no general jurisdiction over Amazon in California because the connection with the forum was not unique); *Capital Credit Inc. v. Mainspring Am., Inc.*, No. A-19-CV-797-LY, 2020 WL 4043499, at *3 (W.D. Tex. July 17, 2020), *report and recommendation adopted*, No. 1:19-CV-797-LY, 2020 WL 9810026 (W.D. Tex. Aug. 11, 2020) (finding no general jurisdiction over Amazon in Texas because Amazon "does business everywhere" and there was no evidence that Texas was the "center" of operations). Accordingly, Nautilus has failed to make out a prima facie case of general jurisdiction as to both Coaster and Amazon.

Id.

Tecomet's website represents that it has 2,500 employees and operates across sixteen global manufacturing facilities in five countries. See https://

32

www.tecoment.com/about/our-story/. Tecomet asserts that it is the largest contract manufacturer to the orthopedic industry. Id. The court cannot conclude based on the sparse facts the plaintiffs have provided that the existence of a single plant in Wisconsin—even if it is operational, manufactures product and hires Wisconsin employees—is sufficient to make Tecomet "at home" in Wisconsin.

This is particularly true when the court considers the broader principles of basic fairness enshrined in the Due Process Clause. It does not comport with traditional notions of fair play and substantial justice to conclude that Massachusetts-based Tecomet should have had reason to know when it purchased a plant in Kenosha, Wisconsin—two years *after* Mr. Burlingham had his implant and two and a half years *before* it would acquire Symmetry—that that purchase would cause it to be haled into court in Wisconsin to address the alleged failure of a component it did not manufacture.

This court does not have general jurisdiction over Tecomet.

        d.    Specific Jurisction

        i.    **Wis. Stat. §801.05(2)-(12)**

The Wisconsin long-arm statute lists numerous activities that can give rise to specific personal jurisdiction over a foreign defendant. The plaintiffs did not address any of these in their opposition brief. Many are not even arguably applicable: §801.05(2) (suits brought under Wisconsin statutes that provide for specific jurisdiction); §801.05(5) (suits arising out contracts to provide goods or services in the state); §801.05(6) (suits involving disputes over local property);

§801.05(7) (suits involving deficiency judgments on foreclosures or resale of real property); §801.05(8) (D&O suits against directors or officers of domestic corporations); §801.05(9) (suits involving taxes assessed or levied under Wisconsin law); §801.05(10) (insurance suits involving in-state insureds or events); §801.05(11) (certain marital actions); §801.05(11m) (suits involving certain restraining orders or injunctions); and §801.05(12) (suits against the personal representative of a deceased person if there would have been jurisdiction over the deceased).

That leaves two possible options: §801.05(3), which gives a Wisconsin court specific personal jurisdiction over "any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant," and §801.05(4), which gives a Wisconsin court specific jurisdiction over "any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant," assuming that the defendant was carrying on solicitation or service activities within the state or that products or materials processed, serviced or manufactured by the defendant were used or consumed in the state within the ordinary course of trade.

Neither the complaint nor the plaintiffs' arguments support specific jurisdiction under §801.05(3). The complaint alleges that the femoral neck that is the subject of the suit was manufactured by Symmetry (a Delaware corporation headquartered in Indiana) in conformity to specifications from Portland Orthopaedics (an Australian company). Dkt. No. 1. The complaint

34

does not allege where the femoral neck was manufactured, but Hinora's undisputed declaration asserts that it was manufactured in Symmetry's Warsaw, Indiana facility. Dkt. No. 15-1 at ¶9. This lawsuit, therefore, is not an action claiming an injury arising out of an act or omission by Tecomet in Wisconsin.

Nor do the complaint or opposition brief support specific jurisdiction under §801.05(4). The complaint alleges an injury—presumably to a person in Wisconsin (Mr. Burlingham) that arose out of the manufacture and implantation of the femoral head. The femoral head was manufactured in Indiana; the complaint does not state the geographic location in which it was implanted. But assuming that the injury occurred at implantation in 2010, there is no evidence that at that time Tecomet was conducting "solicitation or service activities" in Wisconsin (it did not buy the Kenosha plant until 2012) or that Tecomet's products or materials were being used or consumed within the state in the ordinary course of trade. If the injury occurred at the time Mr. Burlingham had to have his second surgery (in 2020), the plaintiffs have provided no evidence that Tecomet was soliciting in Wisconsin (other than the website available to anyone) or conducting any "service activities" in Wisconsin.

The evidence does not support specific jurisdiction under Wisconsin's long-arm statute.

ii.     **Due Process**

For due process purposes, specific personal jurisdiction "requires that (1) the defendant has purposefully directed his activities at the forum state or

35

purposefully availed himself of the privilege of conducting business in the state; (2) the alleged injury arises out of or relates to the defendant's forum-related activities; and (3) any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice." Rogers v. City of Hobart, Indiana, 996 F.3d 812, 819 (7th Cir. 2021); see also Abelesz v. OTP Bank, 692 F.3d 638, 654 (7th Cir. 2012) ("Specific jurisdiction is jurisdiction over a specific claim based on the defendant's contacts with the forum that gave rise to or are closely connected to the claim itself."). For purposes of specific jurisdiction, "[t]he relevant contacts are those that center on the relations among the defendant, the forum, and the litigation." Advanced Tactical Ordnance, 751 F.3d at 801.

The plaintiffs have not established—and cannot establish—that the alleged injury arose out of or relates to the defendant's forum-related activities. Tecomet had no relationship to the manufacture or sale of the M-Cor system implanted in Mr. Burlingham. The only tie to this state demonstrated by the record evidence arises from a manufacturing facility that Tecomet did not purchase until two years after Mr. Burlingham's hip replacement, that never manufactured a modular hip system or any components for such system and that Tecomet purchased two and a half years *before* it purchased the company that *had* manufactured the system. At the time Tecomet acquired Symmetry, it had been five years since Symmetry last had manufactured a femoral neck component for Portland Orthopaedics. The undisputed evidence establishes

36

that Tecomet never designed manufactured, tested or created warnings for the M-Cor Modular System.

The injury does not arise out of Tecomet's forum-related activities.

e.    Conclusion

The court has neither general nor specific personal jurisdiction over Tecomet. It will grant Tecomet's motion to dismiss for lack of personal jurisdiction.

4.    Failure to State a Claim

If the court had personal jurisdiction over Tecomet, it would have been required to consider whether the plaintiffs had stated a claim against Tecomet as a successor corporation. With limited exceptions, a successor corporation is not liable for the transferring company's debts and liabilities. Veritas Steel, LLC v. Lunda Constr. Co., 389 Wis. 2d 722, 732 (Wis. 2020). As the Wisconsin Supreme Court has explained, the question is "whether the de facto merger, mere continuation, and fraudulent transaction exceptions to the rule against successor liability apply in this case." Id. at 727.

In support of its motion, Tecomet filed a declaration by Hinosa in which he referred to Tecoment's "acquisition" of Symmetry. Dkt. No. 13-1 at ¶3. The plaintiffs attached to their opposition brief an article in which the CEO of Symmetry referred to the transaction as a "merger" with Tecomet. Dkt. No. 18 at 10 (citing Dkt. No. 18-8). If the court had had jurisdiction over the Rule 12(b)(6) motion, it could not have considered either the declaration or the

37

article because in ruling on a Rule 12(b)(6) motion, the court may consider only the allegations within the four corners of the complaint.

The complaint alleges that Tecomet "completed the purchase of SYMMETRY in December 2014, including various of its assets and inventory, and became the sole authorized manufacturer, seller and distributor of the M-Cor Femoral Neck medical device whose failure is the subject matter of this lawsuit from that point forward as the successor entity to SYMMETRY." Dkt. No. 1 at ¶10. It alleges that "TECOMET, as a successor of interest to SYMMETRY, is subject to liability for the damages and injuries sustained by Plaintiffs under the 'Product Line Transfer' theory of strict liability, as is recognized under Wisconsin law." Id. at ¶35.

The complaint alleges that Tecomet purchased assets and inventory. It does not allege that Tecomet acquired Symmetry's debts and liabilities, that the transaction amounts to a merger, that Tecomet is a continuation of Symmetry or that Symmetry fraudulently entered into the transaction to avoid liability. In their opposition brief, the plaintiffs rely on a single case, Janusz. But the eight-page motion for summary judgment in that case was filed by *Symmetry*—not Tecomet—and Symmetry brought that motion after the parties had engaged in discovery and supported their pleadings with evidence. Id. at 999.

Finally, the court is stymied by the plaintiffs' "product line transfer" theory. Decades ago, the Seventh Circuit held that "there is no 'product line' theory transferring to a purchaser corporation the liabilities of the seller under Wisconsin law." Leannais v. Cincinnati, Inc., 565 F.2d 437, 441 (7th Cir.

38

1977). The allegations do not plead *de facto* merger or suggest that Tecomet acquired Symmetry's liabilities. If the court had had personal jurisdiction over Tecomet, it would have required the plaintiffs to amend their complaint to clarify the basis for a successor liability claim.

## II. Defendant Symmetry Medical, Inc.'s Rule 12(b)(2) Motion to Dismiss (Dkt. No. 14)

A. <u>Symmetry's Brief in Support</u> (Dkt. No. 15)

Symmetry also asserts that the court lacks personal jurisdiction. Symmetry says that it never sold or distributed the system (or the femoral neck component) to any customer in Wisconsin. Dkt. No. 15 at 2. It maintains that it fabricated the femoral neck component under Portland Orthopaedic's specifications and shipped the femoral components to Portland Orthopaedic's facility in Australia. <u>Id.</u>

Like Tecomet, Symmetry argues that it is not "at home" in Wisconsin for purposes of general jurisdiction. <u>Id.</u> at 4. It says that it is "at home" only in Delaware, where it is incorporated, and Indiana, where it maintains its principal place of business. <u>Id.</u> at 5. With respect to specific jurisdiction, Symmetry argues that it did not purposefully direct its business to Wisconsin and did not avail itself of Wisconsin's laws; it asserts that its limited contacts with Wisconsin have no connection to the plaintiffs' alleged injury. <u>Id.</u> at 5. Symmetry asserts that it fabricated Portland Orthopaedic's femoral neck components in Warsaw, Indiana; shipped them to Portland Orthopaedic's facility in Australia; and never was involved in the marketing, advertising, sale or distribution of the M-Cor System. <u>Id.</u> at 8 (citing Dkt. No. 15-1 at ¶¶9, 10).

39

Symmetry maintains that it never designed, manufactured or advertised any products for sale in Wisconsin and never has solicited business from customers or entities in Wisconsin. Id. at 8. (citing Dkt. No. 15-1 at ¶¶11-13). Symmetry contends that it is not registered to do business in Wisconsin, has no place of business in Wisconsin and owns no property here. Id. (citing Dkt. No. 15-1 at ¶¶14-15). While Symmetry admits that over the past sixteen years, it sold and shipped certain components to two contract manufacturers and one original equipment manufacturer in Wisconsin, it maintains that none of the components were femoral neck components. Id. (citing Dkt. No. 15-1 at ¶16). Symmetry asserts that its highest grossing Wisconsin sales year comprised only 0.5% of its total sales and that it sold no products in Wisconsin in 2010, the year of Mr. Burlinghams' implantation. Id. at 9.

Symmetry argues that Portland Orthopaedic's activities shouldn't confer jurisdiction over Symmetry. Id. It contends that the fact that the injury occurred in Wisconsin isn't enough to confer jurisdiction where Symmetry never sold the femoral neck components or the M-Cor system in Wisconsin. Id. Symmetry labels its contacts with Wisconsin as "random, fortuitous or attenuated." Id. at 10.

B.    Plaintiffs' Response (Dkt. No. 18)

When the plaintiffs uploaded their opposition brief (Dkt. No. 18), they used the court's CM/ECF system to link the brief to both Tecomet's motion to dismiss (Dkt. No. 12) and Symmetry's motion to dismiss (Dkt. No. 14). But the opposition brief is titled, "Plaintiffs' Brief in Opposition to Defendant Tecomet,

40

Inc.'s Rule 12(b)(2) and 12(b)(6) Motion(s) to Dismiss." Dkt. No. 18 at 1. The body of the brief addresses only the arguments raised by Tecomet in its motion to dismiss; it does not respond to or acknowledge Symmetry's separate motion. The plaintiffs have not responded to the separate facts raised by Symmetry in its motion to dismiss.

      C.    <u>Symmetry's Reply Brief</u> (Dkt. No. 20)

Symmetry's reply focuses on the fact that although the plaintiffs linked their opposition brief to both Tecomet's and Symmetry's motions to dismiss, the brief does not address Symmetry's motion. Dkt. No. 20 at 1-2. Symmetry insists that the personal jurisdiction analysis must focus on *Symmetry's* relationship to Wisconsin and maintains that Symmetry lacks the requisite minimum contacts. <u>Id.</u> at 2. Symmetry reiterates that it is not home in Wisconsin, so general jurisdiction does not exist. <u>Id.</u> at 3. As for specific jurisdiction, Symmetry points out that the plaintiffs do not dispute that Symmetry was involved in manufacturing only a single component of the system and "played no role in the design, development, or sale of the System to patients," and that the plaintiffs have not pointed to evidence that "even suggests that Symmetry's limited involvement with the M-Cor System was somehow connected to Wisconsin." <u>Id.</u> Finally, Symmetry cites the plaintiffs' failure to refute Symmetry's declarations that it has almost no connection to Wisconsin; never has designed, manufactured, marketed or advertised products in Wisconsin; never has solicited business in Wisconsin; and never

41

has offered services or offered assistance regarding its products in Wisconsin. Id. at 4.

D.    Plaintiffs' Sur-reply (Dkt. No. 26)

The court already has explained that the plaintiffs did not seek leave to file a sur-reply brief.

As they did with the opposition brief, when uploading their unauthorized sur-reply brief the plaintiffs used the CM/ECF system to link the sur-reply to both Tecoment's motion to dismiss (Dkt. No. 12) and Symmetry's motion to dismiss (Dkt. No. 14). Dkt. No. 26. This time, the plaintiffs titled the pleading, "Plaintiffs' Surreply Brief in Opposition to Defendants Symmetry and Tecomet Rule 12 Motion(s) and Motion for the Imposition of Sanctions." Id. at 1. In the last paragraph of the sur-reply, the plaintiffs indicate that the sur-reply was being submitted "in opposition to the Rule 12 Motions to Dismiss filed by both Tecomet and Symmetry." Id. at 7. But the *body* of the sur-reply does not reference any of the arguments in Symmetry's briefs.

E.    Analysis

For the reasons the court stated when addressing Tecomet's motion to dismiss, the court will not consider the plaintiffs' unauthorized sur-reply. In addition to the reasons the court already has discussed, the court will not consider the sur-reply as to Symmetry because it does not identify any portion of Symmetry's reply brief that raised a new argument not raised in its opening brief (or reference Symmetry's reply brief at all).

As to personal jurisdiction, the burden was on the plaintiffs to make a *prima facie* case that the court has personal jurisdiction over Symmetry. Symmetry has produced an affidavit from Hinora, former vice president of Symmetry and current vice president of Tecomet. Dkt. No. 15-1. Hinora avers that Tecomet acquired Symmetry on December 4, 2014. Id. at ¶1. He avers that Symmetry is a wholly owned subsidiary of Tecomet. Id. at ¶2. Since 1996, Symmetry has had its principal place of business in Warsaw, Indiana and has been incorporated under the laws of Delaware. Id. at ¶6. Beginning in 2006 and continuing through 2009, Symmetry "fabricated a number of femoral neck components pursuant to detailed and modified written specifications provided by Portland Orthopaedics . . . an Australian company, for [its] M-Cor Modular Hip System." Id. at ¶7. Symmetry fabricated the components in Warsaw, Indiana and had them shipped them to Matraville, Australia for Portland Orthopaedic's system. Id. at ¶9. Hinora avers that Symmetry never has marketed, advertised, sold or distributed the M-Cor system and never has designed, manufactured, marketed or advertised its products in the State of Wisconsin. Id. at ¶¶10, 11. He avers that from 1996 to the present, Symmetry has not solicited business from any customers or entities, and has not offered services or other assistance regarding its products, in the State of Wisconsin. Id. at ¶¶12, 13. Hinora avers that Symmetry never has been registered to do business in Wisconsin and does not have a registered agent in the State of Wisconsin. Id. at ¶14.

The plaintiffs have not rebutted Symmetry's evidence, nor—as noted—have they responded to the arguments in Symmetry's motion or reply brief.

The court does not have general jurisdiction over Symmetry because it is not at home in Wisconsin—it is at home in Delaware and Indiana. The court cannot exercise specific jurisdiction because the plaintiffs have not identified any section of Wis. Stat. §801.05 that would support the exercise of specific jurisdiction or an action that Symmetry purposefully directed at Wisconsin. See Burger King, 471 U.S. at 476. Symmetry admits that, over the past sixteen years, it has sold components to two contract manufacturers and one original equipment manufacturer in Wisconsin, but Hinora's unrebutted declaration avers that none of the components were related to the femoral neck components or the M-Cor system. Dkt. No. 15-1 at ¶16. More important, Symmetry avers that it did not solicit these customers; the customers contacted Symmetry and Symmetry's sales to Wisconsin were nominal. Its lowest grossing Wisconsin sales year was 0% of total sales and its highest grossing year was 0.5% of total sales. Id. Symmetry sold no products in Wisconsin in 2010, when Mr. Burlingham had the implant, or in 2020, when he had the revision surgery. Dkt. No. 15 at 9. It does not comport with the traditional notions of fair play and substantial justice for Symmetry to be haled into court in Wisconsin for these, at best, random, fortuitous or attenuated contacts. See Burger King, 471 U.S. at 475.

The court will grant Symmetry's motion to dismiss.

44

**III. Plaintiffs' Motion for Alternate Service on Certain Defendants and Memorandum of Law (Dkt. No. 17) and Civil L.R. 7(h) Expedited Non-Dispositive Motion to Extend Time to Serve Defendants (Dkt. No. 19)**

On December 22, 2022, the plaintiffs filed a motion under Fed. R. Civ. P. 4(h) and 4(f)(3), asking the court to authorize alternate means of service on Mipro Ortho Pte, a foreign corporation domiciled in Singapore, and Mipro US. Dkt. No. 17. The plaintiffs asserted that they had filed their complaint on September 28, 2022; the motion alleged that they had served all the defendants using "various means." Id. at ¶2.

On January 23, 2023, the plaintiffs filed a Rule 7(h), expedited, non-dispositive motion for and extension of sixty days to serve Mipro Ortho Pte, Ltd., Mipro US and Portland Orthopaedics. Dkt. No. 19. The plaintiffs represent that Maxx Health, Inc. takes no position on the motion and that Tecomet and Symmetry will not oppose the motion. Id. at ¶2.

    A.   <u>Motion to Extend Time to Serve Defendants</u> (Dkt. No. 19)

The plaintiffs have asked for additional time to serve Mipro Ortho Pte, Ltd., Mipro US. Inc. and Portland Orthopaedics. Dkt. No. 19 at ¶7. According to the plaintiffs, the "120-day period for effecting service on the defendants will expire 120 days after the date of filing," or on January 26, 2023. Id. at ¶6.

The plaintiffs misapprehend the amount of time allotted by the Federal Rules of Civil Procedure to effect service on Mipro US. Rule 4(m) states that if a defendant is not served within *ninety* days after the complaint is filed, "the court—on its own motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that

45

service be made within a specified time." The plaintiffs filed their complaint on September 28, 2022 and as of January 23, 2023—one hundred seventeen days later—they appear not to have served Mipro Ortho Pte, Ltd., Mipro US or Portland Orthopaedics.

The rule goes on to say that if the plaintiff shows good cause for failing to serve within the ninety-day period, the court must extend the time for service for an appropriate period. Id. The plaintiffs' motion to extend time does not state good cause—or any cause—for the fact that they did not serve these defendants within the ninety-day period, likely because they were under the misimpression that they had 120 days in which to effect service. If the failure to timely serve was based solely on the plaintiffs' counsel's unfamiliarity with Rule 4(m), that would not be sufficient to state good cause. "[S]imple attorney neglect, without the presence of substantial extenuating factors such as sudden illness or natural disaster, cannot constitute the sole basis for a 'good cause' determination." Floyd v. United States, 900 F.2d 1045, 1047 (7th Cir. 1990) (citation omitted). On the other hand, dismissal is not mandated "in every case where the delay in service is caused *in part* by attorney inadvertence;" if the inadvertence is "accompanied by other factors," a court may yet find good cause for the failure to serve. Id. The good cause standard "primarily considers the diligence of the party seeking amendment" of a deadline. Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am., 424 F.3d 542, 553 (7th Cir. 2005). Good cause exists when a movant shows that "despite

[their] diligence the timetable could not have reasonably been met." <u>Tschantz v. McCann</u>, 160 F.R.D. 568, 571 (N.D. Ind. 1995).

It appears that the plaintiffs made only a single attempt to serve Mipro US, by mailing a copy of the summons and complaint to an address in Plymouth Meeting, Pennsylvania on October 13, 2022. Dkt. No. 17-4. When that mailing was returned to the plaintiffs with the indication "Vacant Unable to Forward," the plaintiffs filed their motion for alternate service (which the court addresses below).

As to Mipro US, the plaintiffs filed their motion for an extension of time to serve after the ninety-day deadline under Rule 4(m) had passed, without stating good cause for their failure to timely serve and without attempting other methods of service than the one that failed. The court will deny the plaintiffs' motion to extend time to serve Mipro US without prejudice; it will not dismiss Mipro US before giving the plaintiffs the opportunity to try to state good cause for their failure to timely serve this defendant.

The analysis is different as to Mipro Ortho Pte and Portland Orthopaedics. Rule 4(h)(2) governs service on a corporation "at a place not within any judicial district of the United States." It requires a plaintiff to effectuate service "in any manner prescribed by Rule 4(f) for serving an individual," except personal delivery. Rule 4(f) allows service by a variety of means. And Rule 4(m) states that it does not apply to service in a foreign country under Rule 4(f). Mipro Ortho Pte (Singapore) and Portland Orthopaedics (Australia) are domiciled in foreign countries.

47

The plaintiffs indicate that they served Mipro Ortho Pte via U.S. mail, "post-prepaid," on October 17, 2022. Dkt. No. 19 at ¶7(A). They indicate that they served Portland Orthopaedics "via U.S. Mail, post-prepaid," on the same date (although they do not provide the address they used). Dkt. No. 19 at ¶7(C). It is not clear that service by U.S. mail complies with Rule 4(f). The plaintiffs do not state whether service by U.S. mail is an "internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f)(1). They do not indicate whether service by U.S. mail is "prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction." Fed. R. Civ. P. 4(f)(2)(A). They do not indicate whether service by U.S. mail constitutes service "as the foreign authority directs in response to a letter rogatory or a letter of request." Fed. R. Civ. P. 4(f)(2)(B). Nor do the plaintiffs appear to have used "any form of mail that the clerk addresses and sends to [the corporation] and that requires signed receipt." Fed. R. Civ. P. 4(f)(2)(C)(ii).[5]

Because Rule 4(m) does not apply to service in a foreign country and because it appears that the plaintiffs did not utilize the appropriate means of service under Fed. R. Civ. P. 4(f), the court will grant the plaintiffs' motion for an extension of time to serve as to Mipro Ortho Pte and Portland Orthopaedics.

---

[5] Although Rule 4(f)(2)(C)(i) allows service by personal delivery on an *individual* in a foreign country, Rule 4(h)(2) does not allow service by personal delivery on a *corporation* in a foreign country.

48

B.    <u>Motion for Alternate Service on Certain Defendants and</u>
       <u>Memorandum of Law</u> (Dkt. No. 17)

The plaintiffs appear to seek leave to use alternate means of service on Portland Orthopaedics, Mipro Ortho Pte and Mipro US, although they do not state what means they wish to use, or even clearly ask to use alternate means, to serve Portland Orthopaedics.

Portland Orthopaedics was an Australian corporation that, according to the plaintiffs, went into receivership on December 5, 2008. Dkt. No. 17 at ¶5. The plaintiffs assert that Mipro Ortho Pte Ltd. acquired "certain" Portland Orthopaedics assets, including the existing inventory of the manufactured M-Cor Modular Hip System. <u>Id.</u> at ¶6. The plaintiffs' attorney indicates that he mailed a summons and complaint to Portland Orthopaedics on October 17, 2022, and that it was not returned as undeliverable. <u>Id.</u> Counsel's affidavit avers that on October 17, 2022, he mailed "with prepaid postage, via the United States Postal Service via First Class Mail, an authenticated copy" of the summons and complaint to Portland Orthopaedics at "Unit 344 McCauley St Metraville, NSW, 2039 Australia." Dkt. No. 22 at ¶3. Attached to the affidavit is a receipt from the U.S. Postal Service, which shows only that a "Large Envelope" was sent to "Australia" on October 17, 2022. Dkt. No. 22-1. The plaintiffs also indicate that Portland Orthopaedics "ceased its operations related to the M-Cor Modular Hip System it once produced after its receivership ended." Dkt. No. 17 at ¶7.

The plaintiffs indicate that Mipro Ortho Pte is part of a subsidiary operating agreement with Mipro US. Dkt. No. 17 at ¶8. They indicate that

49

Mithro Ortho Pte's principal place of business is 80 Robinson Road, Singapore 068898. Id. The plaintiffs say they mailed a summons and complaint to Mipro Ortho Pte at that address by "U.S. Mail, post-prepaid," on October 17, 2022 and that it was not returned as undeliverable. Id. at ¶9. Attached to the motion is a U.S. Postal Service receipt, indicating that on October 17, 2022, an international "Large Envelope" was mailed by first-class mail to "Singapore." Dkt. No. 17-1. Counsel's *affidavit* indicates that he sent a copy of the summons and complaint via "FedEx International to Mipro Ortho PTE, Ltd. c/o P K Loke & Partners, L.L.P., 80 Robinson Road, #11-01, Singapore, 068898, SG." Dkt. No. 21 at ¶3. Attached to that affidavit is a January 20, 2023 proof-of-delivery form (with tracking number) showing that a package was shipped from Racine, Wisconsin to Singapore, was delivered on January 19, 2023 and was signed for by "J. Judy." Dkt. No. 21-1 at 1. Also attached is a FedEx payment receipt showing that the package was mailed to the PK Loke & Partners address. Id. at 2.

Finally, the plaintiffs assert that Mipro US is a Pennsylvania corporation with its principal place of business in Plymouth Meeting, Pennsylvania. Dkt. No. 17 at ¶13. They assert that, in Pennsylvania, service may be sent to the registered address of the entity that appears on the records of the Pennsylvania Department of State (although the motion does not say what address is reflected on that website). Id. The plaintiffs assert that they served the summons and complaint by U.S. mail, "post-prepaid," to Mipro US at 531 Plymouth Road, St. 526, Plymouth Meeting, PA 19462 (the motion does not

50

state the date on which the plaintiffs mailed the summons and complaint). Id. This mailing was returned to the plaintiffs as undeliverable. Id.; Dkt. No. 17-4.

The plaintiffs argue that they have "made every reasonable effort to identify the physical addresses by which service could be effectuated upon the Motion Defendants and thereafter attempted to have such accomplished," but that their "efforts have proven unsuccessful for the reasons noted above." Dkt. No. 17 at ¶17. They ask the court to allow them to use alternate methods of service, citing cases from the Eleventh Circuit, the Southern District of Florida and the Ninth Circuit (as well as some cases in which the citation does not identify the ruling court). Id. at ¶¶18-21.

The plaintiffs state that "in an abundance of caution," they would like to serve Mipro Ortho Pte through an "accounting auditing firm" that they found listed as "P K LOKE & PARTNERS LLP" with the same registered address as Mipro Ortho PTE (80 Robinson Road, #11-01, Singapore, 068898, SG). Dkt. No. 17 at ¶¶11-12. The plaintiffs say that they located this firm using the Open Government Data in Singapore website (https://opengovsg.com/corporate/200904053M). Id. at ¶11.

The plaintiffs ask the court for permission to serve Mipro US by mailing a copy of the summons and complaint to counsel for defendant Maxx Health, Inc., with whom they assert Mipro US shares office space at 531 Plymouth Road, Ste. 526, Plymouth Meeting, PA 19462, and by mailing the summons and complaint to the Pennsylvania Department of State at 206 North Office

51

Building, 401 North Street, Harrisburg, PA 17120, which they assert was appointed registered agent for Mipro US on February 16, 2021. Id. at ¶14.

C.    Service on Foreign Corporations

Federal Rule of Civil Procedure 4(h) governs service of process on a corporation. Rule 4(h)(2) allows foreign corporations to be served in the same manner as foreign individuals under Rule 4(f), with the exception that a plaintiff may not serve a foreign corporate defendant by personal delivery. Fed. R. Civ. P. 4(h)(2). Rule 4(f) states that an individual may be served:

> (1)    by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2)    if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>
> > (A)    as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
> >
> > (B)    as the foreign authority directs in response to a letter rogatory or letter of request; or
> >
> > (C)    unless prohibited by the foreign country's law, by:
> >
> > > (i)    delivering a copy of the summons and of the complaint to the individual personally; or
> > > (ii)   using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or
>
> (3)    by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

52

"Alternative service is 'neither a "last resort" or "extraordinary relief"', but simply one means which enables service of process on an international defendant." <u>Smith v. SMS Group, Inc.</u>, Case No. 22-cv-1303, 2022 WL 15460279, at *1 (citing <u>In re Paraquat Prod. Liab. Litig.</u>, Case No. 21-MD-3004, 2021 WL 4775284, at *3 (S.D. Ill. October 13, 2021)). "The decision whether to allow alternate methods of serving process under Rule 4(f)(3) is committed to the 'sound discretion of the district court.'" <u>In re Potash Antitrust Litig.</u>, 667 F. Supp. 2d 907, 929 (N.D. Ill. 2009), vacated and remanded *sub nom.* <u>Minn–Chem, Inc. v. Agrium Inc.</u>, 657 F.3d 650 (7th Cir. 2011) and aff'd *sub nom.* <u>Minn–Chem, Inc. v. Agrium, Inc.</u>, 683 F.3d 845 (7th Cir. 2012).

The advisory committee notes to Rule 4 and the case law indicate that a plaintiff should be required to make a showing as to why alternative service should be authorized.

> While the Seventh Circuit has not spoken directly on the steps Plaintiff must take prior to requesting alternative service under Rule 4(f), several district courts in this Circuit have required that a plaintiff first demonstrate why alternative service should be authorized under Rule 4(f)(3). *See Flava Works, Inc. v. Does 1-26*, No. 12 C 5844, 2013 WL 1751468, at *7 (N.D. Ill. Apr. 19, 2013) (citing the advisory committee notes to Rule 4); *In re Paraquat Products Liability Litigation*, 2021 WL 4775284, at *3 (collecting cases); *NBA Properties, Inc. v. Partnerships & Unincorporated Associations Identified in Schedule "A"*, 549 F. Supp. 3d 790 (N.D. Ill. 2021) (finding the Court could authorize service by email as long as Plaintiffs "make a showing as to why alternative service should be authorized"); *1025 W. Addison St. Apartments Owner, LLC v. Grupo Cinemex, S.A. de C.V.*, No. 20-CV-06811, 2021 WL 2136073, at *8 (N.D. Ill. May 26, 2021).

<u>Smith</u>, 2022 WL 15460279 at *1.

The advisory committee notes detail instances when alternative service is appropriate:

> Paragraph 3 authorizes the court to approve other methods of service not prohibited by international agreements. The Hague Convention, for example, authorizes special forms of service in cases of urgency if convention methods will not permit service within the time required by the circumstances. Other circumstances that might justify the use of additional methods include the failure of the foreign country's Central Authority to effect service within the six-month period provided by the Convention, or the refusal of the Central Authority to serve a complaint seeking punitive damages or to enforce the antitrust laws of the United States. In such cases, the court may direct a special method of service not explicitly authorized by international agreement if not prohibited by the agreement. Inasmuch as our Constitution requires that reasonable notice be given, an earnest effort should be made to devise a method of communication that is consistent with due process and minimizes offense to foreign law.

Fed. R. Civ. P. 4(f) advisory committee's note to 1993 amendment.

D.    Analysis

As the court has noted, it can't determine whether the plaintiffs are seeking leave to use an alternate means of service on Portland Orthopaedics or if so, what alternate means the plaintiffs propose. The plaintiffs acknowledge that Portland Orthopaedics went into receivership on December 2, 2008; defense documents hint that it is operating under a different corporate name. The court will deny without prejudice the plaintiffs' motion for leave to use alternate means of service to serve Portland Orthopaedics; the plaintiffs may renew their request if they believe they need to serve by alternate means.

The plaintiffs ask leave to serve Mipro Ortho Pte by alternate means "in an abundance of caution," having attempted service by U.S. mail. They ask

54

that the court deem proof of delivery on Mipro Ortho Pte's auditors as adequate service likely to give notice to Mipro Ortho Pte.[6]

But it does not appear that the plaintiffs have attempted to utilize any of the accepted methods of international corporate service listed in Rule 4(f). Just in May of this year, Singapore became a contracting party to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. https://www.mlaw.gov.sg/news/press-releases/singapore-accedes-to-service-convention/. The treaty is available for the plaintiffs' consideration. https://www.hcch.net/en/instruments/conventions/specialised-sections/service. Concededly, service via the Hague Convention can be complicated. But Rule 4(f)(2)(C)(ii) allows service on an international corporation by mail as long as the foreign country's law does not prohibit it and the mail is sent by means that requires a signed receipt. The plaintiffs have not indicated whether Singapore's law prohibits service by mail and they did not send the complaint via a form of mail that required a receipt. They say that "upon information and belief none of the proposed methods of service violates any international agreements including those between the United States and . . . Singapore."

---

[6] The plaintiffs' motion indicates that "**MIPRO ORTHO PTE** is listed on the Open Government Data in Singapore website at entry https://opengovsg.com/corporate/200904053M." Dkt. No. 18 at ¶11. This is where the plaintiffs say they learned that Mipro Oortho Pte's auditing accounting firm is listed as P K Loke & Partners LLP. Id. The site reflects "P K Loke & Partners LLP" as "Name Audit Firm 1." The court cannot determine from the site how current the information is, but the site does indicate that P K Loke & Partners has the same address as Mipro Ortho Pte. https://www.hcch.net/en/instruments/conventions/specialised-sections/service.

Dkt. No. 17 at ¶22. That is not sufficient. The plaintiffs must demonstrate that service by mail, and on the auditor, would "not be prohibited" by international agreements and the laws of Singapore. See Fed. R. Civ. P. 4(f)(2), (3).

While alternative service is not a "last resort," the court anticipates that before asking leave to file by alternative service, the plaintiffs would have tried to utilize one of the authorized means of serving a foreign corporation. It does not appear that they have done so. The court will deny the motion for alternative service on Mipro Ortho Pte without prejudice.

Finally, the plaintiffs seek to serve Mipro US—the successor distributor of the M-Cor femoral neck medical device and the wholly owned subsidiary of Mipro Ortho Pte—by alternative means. Mipro US is *not* an internationally domiciled corporation; the plaintiffs assert that it is a Pennsylvania corporation. They note that Pennsylvania allows service on the registered address of the entity that appears on the records of the Pennsylvania Department of State, but such service was returned as undeliverable Dkt. No. 17 at ¶13. They seek leave to serve Mipro US by mailing the summons and complaint to counsel for Maxx Health, Inc. because Maxx Health Inc. shares an office space with Mipro US at 531 Plymouth Road, Ste. 526, Plymouth Meeting, PA 19462. Id. at ¶14. The plaintiffs also want to mail a summons and complaint to the Pennsylvania Department of State at 206 North Office Building, 401 North St., Harrisburg, PA 17120. Id. In support of their assertion that Mipro US has designated the Secretary of State as its registered agent, the plaintiffs cite https://opencoprorates.com/companies/us_pa/3871948. Id.

First, the plaintiffs have not demonstrated that they followed Rule 4 in attempting to effectuate service on Mipro US. Because Mipro US is a domestic corporation, Rule 4(f) (including Rule 4(f)(3) authorizing alternate service) does not apply. Rule 4(h)(1)(A) allows a plaintiff to serve a domestic corporate defendant in the manner prescribed in Rule 4(e)(1) for serving an individual. Rule 4(e)(1) requires the plaintiff to follow "state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." The plaintiffs have not explained whether service via U.S. mail to the corporation (and not an officer or agent thereof) complies with *Pennsylvania* law.[7]

Second, the court's research confirms the plaintiffs' assertion that Pennsylvania uses registered *offices* rather than *agents*:

> Q: Does Pennsylvania utilize registered agents?
>
> A: No. Our records indicate a registered office address. Service of Process may be sent to the registered address of the entity that appears on our records. The Secretary of the Commonwealth may accept service as ordered by a Pennsylvania judge. The court order accompanied by the complaint should be sent certified mail to the Department of State; return receipt requested. The statutory fee is $70 for each defendant to be served.

https://www.dos.pa.gov/BusinessCharities/Business/Resources/Pages/FAQ. aspx. The "opencorporates" website the plaintiffs used does indicate that

---

[7] 246 Pa. Code §310 requires service on an executive officer, partner or trustee of the corporation, on an agent or person in charge of the corporation's usual place of business, on an agent authorized by appointment to receive service or by mailing via certified mail (or some other form that would have a return receipt) showing receipt by the corporate entity. The Pennsylvania Secretary of State's web site lists the president of Mipro US and his address. https:// file.dos.pa.gov/search/business.

57

sometime between February 16, 2021 and April 9, 2022, there was an "Addition of officer Secretary of State, agent." https://opencorporates.com/companies/us_pa/3871958.

The plaintiffs did not file this lawsuit until September 2022. Just as they have not explained how their mailed service complied with Pennsylvania's law governing service, they have not explained why they did not ask a Pennsylvania judge to order the Secretary of the Commonwealth to accept service. The plaintiffs say that "[d]espite the reference to a 'Pennsylvania' judge, an order emanating from this Court will have the same effect at resulting in providing notice to the defendant as to the existence of this lawsuit as one from a Pennsylvania judge." Dkt. No. 17 at ¶15. They provide no support for this assertion; presumably if an order from a federal judge in another state would be sufficient, the Pennsylvania Department of State's website would have said as much.

Third, the plaintiffs have not explained how Maxx Health is related to Mipro US (other than asserting that the two office at the same address). The plaintiffs' attorney filed an affidavit asserting that someone named Ashesh Shah, current CEO of Maxx Health, "has intimate insider knowledge of the history of ownership and production, distribution and sale of the M-Cor Modular Hip system" and the implant into Mr. Burlingham. Dkt. No. 17-2 at ¶3. Counsel avers that "given the historical legal relationship by and between **MAXX ORTHO** and **MAXX HEALTH** it is reasonable for the Court to conclude that service of the instant Summons and Complaint" on counsel for Maxx

58

Health "will provide notice to **MAXX ORTHO** and that Maxx Ortho "can hardly claim ignorance of this matter given their office sharing relationship with **MAXX HEALTH**." Id. at ¶4. This makes no sense; the plaintiff is seeking to serve *Mipro US*, not *Maxx Ortho*, through alternate service via Maxx Health.

The plaintiffs also attached an affidavit from Ashesh Shah, dated September 13, 2017—five years *before* the plaintiffs filed this suit. Dkt. No. 17-3. Shah averred that Maxx Ortho entered into an ongoing consulting agreement with Mipro US in April 2009. Id. at ¶6. But Shah averred that Maxx Ortho is not a successor company to any other entity and "specifically is not a successor to Portland Orthopaedics Limited, Plus Orthopaedics Inc., Mipro US, Inc. or Maxx Health Inc." Id. at ¶9. The affidavit also indicates that the consulting agreement executed on April 7, 2009 between Maxx Ortho and Mipro US defines Maxx Ortho as a contractor. Id. at ¶19. Shah clarified that Mipro US never assumed any ownership, management, personnel, physical location or general business operations of Portland Orthopaedics and that Portland Orthopaedics did not merge with Mipro US or any of the other defendants in that litigation. Id. at ¶¶23-25. He averred that as of the date of the affidavit—September 13, 2017—Portland Orthopaedics continued to operate in business as PLD Corporation Limited. Id. at ¶25.[8]

The plaintiffs have identified no relationship between Mipro US and Maxx Health; however, the court is aware they are named defendants in another case which indicates that they may have the same registered office. See Sharp v.

---

[8] See https://www.investogain.com.au/company/pld-corporation-limited/.

Mipro US, Inc., Case No. 18-cv-174 (W.D. Wis. 2018). The proof of service filed in the Western District case shows that Maxx Health and Mipro US both were served through personal service on a Chris Lawrence at 531 Plymouth Road, Suite 526, Plymouth Meeting, PA 19462. Id.

The plaintiffs have not demonstrated that they complied with Rules 4(h) or 4(e) or Pennsylvania law in attempting to serve Mipro US. Now, despite that fact, they are asking the court to grant them leave to serve Mipro US through a contractor (or former contractor) of Mipro US who may share office space with Mipro US.

The court will deny without prejudice the motion for alternate service.

## IV. Defendants Tecomet Inc. and Symmetry Medical, Inc.'s Rule 12(b)(2) Motion to Dismiss Humana Health Plan, Inc.'s Claim (Dkt. No. 33)

Finally, Tecomet and Symmetry ask the court to dismiss the claims made by Medical Copay Plan of Froedtert South, Inc. by its plan manager Humana Health Plan, Inc. for lack of personal jurisdiction. Dkt. No. 33.

As noted above, Medical Copy Plan of Froedtert South, Inc. filed a cross-claim through involuntary plaintiff Humana, asserting that it had paid over $44,000 in medical expenses for the injuries Mr. Burlingham incurred as a result of the alleged failure of the femoral head. Dkt. No. 28 at ¶4. The cross-claim asserted all of the plan's subrogation rights against all the defendants. Id. at ¶¶5-6. It asserted its reimbursement and recovery rights against the plaintiffs out of any recovery they may receive. Id. at ¶¶7-8.

In their brief in support of the motion to dismiss Medical Copay's cross-claim against them, Tecomet and Symmetry argue that Medical Copay's claims

60

against Tecomet and Symmetry are derivative of the plaintiffs' claims against Tecomet and Symmetry. Dkt. No. 34 at 2. They remind the court that they have moved for dismissal of the plaintiffs' claims against them based on lack of personal jurisdiction, and Tecomet reiterates that it played no role in the design, development, manufacture, testing, distribution or sale of the hip replacement system. Id. at 3.

In response, counsel for Medical Copay filed a letter, informing the court that it agreed that its subrogation claims against Tecomet and Symmetry derive from the plaintiffs' claims against Tecomet and Symmetry and that Medical Copay did not intend to oppose their motion to dismiss the cross-claim. Dkt. No. 35. Counsel indicated that his client agreed that it would be bound by this court's ruling as to personal jurisdiction. Id.

Because the court has ruled that it does not have personal jurisdiction over Tecomet and Symmetry, and because Medical Copay's claims against Tecomet and Symmetry are derivative of the plaintiffs' claims against those defendants, the court will grant Tecomet and Symmetry's motion to dismiss Medical Copay's cross-claim as to those two defendants.

## V.   Procedural Posture

It took the court much longer than it would have liked to address the motions disposed of in this order. Consequently, on April 19, 2023, counsel for the plaintiffs filed a motion asking the court to schedule a status conference. Dkt. No. 36. The court did so, scheduling a conference for September 28, 2023. At that time, the court planned to advise the parties of its ruling on the

61

pending motions and discuss next steps. The court was unable to attend that status conference or deliver its rulings due to illness. This order reflects the details of the shorter rulings the court had planned to deliver at the September 28 hearing. The court extends its apologies to the parties for the time it took for the court to address the motions and for its inability to provide the rulings as scheduled.

Defendants Tecomet and Symmetry are being dismissed from the lawsuit for lack of personal jurisdiction.

Defendant Maxx Health has waived service, appeared and answered. Dkt. Nos. 4, 5 and 6.

The court will give the plaintiffs additional time to try to serve Portland Orthopaedics Limited and Mipro Ortho Pte Ltd.

Although the time has expired for the plaintiffs to serve Mipro US, Inc., the court has declined to dismiss that defendant until the plaintiffs have an opportunity to explain to the court whether they have good cause for failing to timely serve it.

The plaintiffs must file any motions for extension of time *before* the deadlines the court sets below.

## VI. Conclusion

The court **GRANTS** defendant Tecomet Inc.'s Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction. Dkt. No. 12.

The court **LACKS JURISDICTION** to rule on defendant Tecomet, Inc.'s Rule 12(b)(6) Motion to Dismiss for failure to state a claim. Dkt. No. 12.

The court **GRANTS** defendant Symmetry Medical, Inc.'s Rule 12(b)(2) Motion to Dismiss. Dkt. No. 14.

The court **DISMISSES** defendants Tecomet, Inc. and Symmetry Medical, Inc.

The court **DENIES WITHOUT PREJUDICE** the plaintiffs' Motion for Alternate Service on Certain Defendants and Memorandum of Law. Dkt. No. 17.

The court **DENIES WITHOUT PREJUDICE** the plaintiffs' Civil L.R. 7(h) Expedited Non-Dispositive Motion to Extend Time to Serve Defendants as to defendant Mipro US, Inc. Dkt. No. 19.

The court **GRANTS** the plaintiffs' Civil L.R. 7(h) Expedited Non-Dispositive Motion to Extend Time to Serve Defendants as to defendants Portland Orthopaedics and Mipro Ortho Pte. Dkt. No. 19.

The court **GRANTS** defendants Tecomet Inc. and Symmetry Medical, Inc.'s Rule 12(b)(2) Motion to Dismiss Humana Health Plan, Inc.'s Claim. Dkt. No. 33.

The court **ORDERS** that by the end of the day on **October 20, 2023**, the plaintiffs must file a document with the court explaining why they failed to timely serve Mipro US, Inc. and, if possible, to state good cause for that failure. If the plaintiffs do not file such a statement by day's end on October 20, 2023, the court will dismiss Mirpo US, Inc. for failure to timely serve under Fed. R. Civ. P. 4(m).

63

Case 2:22-cv-01134-PP   Filed 09/30/23   Page 63 of 64   Document 40

The court **ORDERS** that by the end of the day on **December 8, 2023**, the plaintiffs must either file proof of valid service of process on Portland Orthopaedics Limited and Mipro Ortho Pte, Ltd. or request additional time to do so.

Dated in Milwaukee, Wisconsin this 30th day of September, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**